2023 UT App 6

## THE UTAH COURT OF APPEALS

MARTIN J. DIERL,
Appellant,
*v.*
BARRY M. BIRKIN,
Appellee.

Opinion
No. 20210756-CA
Filed January 20, 2023

Third District Court, Silver Summit Department
The Honorable Richard E. Mrazik
No. 170500532

David E. Ross II, Attorney for Appellant

George T. Naegle, Cortney Kochevar, Kristina H.
Ruedas, and Aaron T. Cunningham,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

MORTENSEN, Judge:

¶1 After being injured at a ski resort, Martin J. Dierl underwent a CT scan, which was interpreted by Dr. Barry M. Birkin as being normal. In reality, the scan showed a tumor in Dierl's brain. Some nine months later, after the tumor became symptomatic, Dierl learned of the tumor and had surgery to remove it. He suffered complications associated with the surgery, including permanent partial loss of vision and pituitary gland damage. Dierl sued Birkin for malpractice.

¶2 The district court granted summary judgment to Birkin because Dierl offered no admissible expert testimony establishing

that Birkin's failure to diagnose Dierl's brain tumor nine months earlier proximately caused Dierl's injuries. Dierl appeals, arguing that two expert witness affidavits should have been admitted to establish that Dierl sustained worse complications from surgery than he would have sustained if he had undergone surgery earlier. Because we conclude that the trial court appropriately exercised its discretion in excluding both affidavits, we affirm.

BACKGROUND[1]

¶3     Dierl was injured at a ski resort in Park City in February 2015 and was taken by ambulance to an emergency room. The attending physician ordered a CT scan of Dierl's brain. Birkin, a radiologist, interpreted Dierl's CT brain scan and reported it as a "[n]egative CT," stating that "[t]here are no intracranial masses."

¶4     Beginning in November 2015, Dierl began experiencing "severe headaches, loss of balance, dizziness, speech impediment, memory loss[,] and loss of vision." Dierl saw another doctor, who requested another CT brain scan, along with the records from the earlier brain scan. This doctor "informed Dierl that he had a large tumor in his brain and that was the reason for his suffering and loss of vision." The doctor "also informed Dierl that the tumor was visible in the [earlier scan] and inquired whether [anyone had] informed him of this large brain tumor." "Dierl stated that no one had told him" about the tumor after the earlier scan. In

---

1. "In reviewing the district court's grant of summary judgment, we view the facts in the light most favorable to [Dierl], as the nonmoving party." *Nelson v. 15 White Barn Drive LLC*, 2022 UT App 106, n.3, 517 P.3d 1062 (cleaned up).

December 2015, "Dierl underwent a right pterional craniotomy[2] for resection of the tumor."

¶5 Dierl later filed a complaint for medical negligence against Birkin. Dierl alleged that Birkin "breached the standard of care in failing to diagnose Dierl's brain tumor," which "grew and placed pressure against his optic nerves and pituitary [gland]." Dierl further asserted that Birkin's "breach of the standard of care [was] the proximate cause of Dierl's injuries."

¶6 Dierl timely disclosed a neurosurgeon (Neurosurgeon 1) as an expert witness. Birkin elected to take Neurosurgeon 1's deposition, wherein Neurosurgeon 1 testified that the tumor grew by four millimeters—from twenty to twenty-four millimeters— over the course of the nine months following the February 2015 CT scan. Neurosurgeon 1 also testified that had the tumor been detected in February 2015, it was "most likely that surgical treatment, direct craniotomy, would have been carried out," as it had been in December 2015. Neurosurgeon 1 agreed that— regardless of the size of the tumor—this type of surgery carries certain risks, including "pituitary dysfunction, visual impairment, fluid leak, incomplete resection, [and] damage to the hypothalamus." And Neurosurgeon 1 testified that following Dierl's surgery, Dierl did in fact experience "an increase in his

---

2. A craniotomy is "[a]n operation in which a small hole is made in the skull or a piece of bone from the skull is removed to show part of the brain. A craniotomy may be done to remove a brain tumor or a sample of brain tissue. . . . The piece of bone that is removed from the skull is usually put back in place after the surgery has been done." *Craniotomy*, Nat'l Cancer Inst., https://www.cancer.gov/publications/dictionaries/cancer-terms/ def/craniotomy [https://perma.cc/HCF9-2H9C].

visual loss and panhypopituitarism."[3] After this, the following exchange occurred:

> Q. Can you say, to a reasonable degree of medical probability, that . . . Dierl would not have experienced an increase in his visual loss or panhypopituitarism if the surgery had been performed in February 2015?
>
> A. Well, my opinion is that his risk of those [complications] would be less, had he had surgery in or around February 2015, as compared to December of 2015.
>
> Q. That's fair. And my question is a little bit different, though. I understand that you—it's your opinion that there is an increased risk there, but can you say, to a reasonable degree of medical probability, that had . . . Dierl undergone surgery in February of 2015, that he would not have had an increased visual loss?
>
> A. No.
>
> Q. And can you say, to a reasonable degree of medical probability, that had . . . Dierl undergone surgery in February of 2015, that he would not have experienced complications related to panhypopituitarism?

---

3. Panhypopituitarism is "[a] rare condition in which the pituitary gland stops making most or all hormones." *Panhypopituitarism*, Nat'l Cancer Inst., https://www.cancer.gov/publications/dictionaries/cancer-terms/def/panhypopituitarism [https://perma.cc/HHQ7-XS88].

A. No.

. . . .

Q. My question is, can you say, to a reasonable degree of medical probability, that had . . . Dierl undergone surgery in February of 2015, that he would not have the exact same injury to his vision today?

A. No, because I would be—I would be speculating.

Q. Okay. Same question in regards to his panhypopituitarism. . . . [H]ad the surgery been completed in February of 2015, can you say, to a reasonable degree of medical probability, that . . . Dierl would not have experienced the exact same injury to his pituitary gland that he experienced following his surgery in December of 2015?

A. No.

¶7      Later, Birkin filed a motion for summary judgment, arguing that Dierl had "failed to establish a prima facie case of medical negligence against Birkin with expert testimony" because "Dierl's only causation expert failed to establish that any delay in diagnosis of . . . Dierl's tumor caused . . . Dierl actual damages." Birkin further argued that Dierl's "reliance upon merely an increased risk of surgical complication, but nothing more, does not amount to actual damages and cannot sustain a cause of action for medical negligence."

¶8      Dierl opposed the motion and provided a new affidavit by Neurosurgeon 1 stating, "Affiant opines that due to the significant enlargement of the tumor from February 2015 to December 2015[,] . . . Dierl's vision loss was greater than it would have been if the

surgery had been conducted in February or thereabouts instead of December 2015." The affidavit continued, "Affiant states that based only on a February 2015 CT brain scan [without] contrast showing a 20 mm size tumor, he could not opine to any medical degree of certainty or probability as to any injury . . . Dierl may have sustained from a craniotomy in February 2015."

¶9 About a month later, Dierl designated another neurosurgeon (Neurosurgeon 2) as a rebuttal expert witness and filed an affidavit from Neurosurgeon 2, which stated that Neurosurgeon 2 had "determined to a medical degree of certainty . . . [t]hat the failure of [Birkin] to diagnose the head CT scan and report the tumor in . . . Dierl's brain on February 12, 2015[,] allowed the tumor to enlarge in the cephalo-caudal dimension from 15.8 mm to 23 mm by the time it was diagnosed in late November 2015." Neurosurgeon 2 continued by stating, "[i]t is more likely than not that . . . Dierl suffered a worse outcome with respect to his vision than had the tumor been diagnosed and treated in February of 2015." Neurosurgeon 2 also declared that the changes in the tumor "were significant and decreased the chances of a better outcome from surgery" and "[t]hat the failure of [Birkin] to diagnose the tumor in February 2015 contributed post tumor resection in December 2015 to a poor visual outcome and significantly enhanced the chance of permanent vision loss to . . . Dierl."

¶10 Later, Dierl filed a motion under rule 56 of the Utah Rules of Civil Procedure asking the court to allow him "to cite to [Neurosurgeon 2's] Affidavit in support of [Dierl's] position that genuine issues of material fact exist." *See* Utah R. Civ. P. 56(e)(1). In response to Birkin's point that Dierl had failed to establish causation and damages as necessary for his prima facie case, Dierl stated, "Assuming arguendo . . . that [Dierl] has failed to properly support an assertion of fact, the Court should give [Dierl] an opportunity to support or address the fact." Dierl's disclosure of Neurosurgeon 2 had been timely for rebuttal expert witnesses but

had been made some three months after the deadline for disclosures of experts in Dierl's case-in-chief.

¶11 The district court held oral arguments on both motions. After argument, the court gave an oral ruling indicating that the "deposition testimony from [Dierl's] designated expert shows that [Dierl did] not have any expert testimony" asserting "that the delay in surgery from February 2015 to December 2015 proximately caused any increase in . . . Dierl's vision loss or any increase in his pituitary dysfunction or otherwise that the outcome would have been different had the surgery occurred earlier than it did." Accordingly, the court reasoned, Dierl was "left with a lack of evidence of an essential element of [his] claim." The court then considered Neurosurgeon 1's affidavit testimony, stating that if it was admissible, it would create a "genuine issue of material fact as to whether [Dierl] can prove proximate cause." However, the court relied on *Webster v. Sill*, 675 P.2d 1170 (Utah 1983), to exclude the affidavit for this purpose, stating that when one "stakes a clear position in a deposition that is not modified on cross-examination, he may not thereafter raise an issue of fact by his own affidavit which contradicts his deposition unless he can provide an explanation of the discrepancy." The court reasoned that "[t]here simply [was] no explanation for the about face that [Neurosurgeon 1] makes in . . . his affidavit," and stated that "[a]bsent any such explanation[,] the Court is left with no other conclusion than [that Dierl] is directly raising a genuine issue of fact through a contradictory statement that is made without explanation or context and under *Webster v. Sill* that is not permitted."

¶12 As to the admissibility of Neurosurgeon 2's affidavit, the court stated that it had not been "produced as part of [Dierl's] initial expert disclosures [related to his] case in chief as required by" rule 26(a)(4)(C)(i) of the Utah Rules of Civil Procedure. The court noted that Neurosurgeon 2 "was disclosed as a rebuttal expert, not as an expert as part of [Dierl's] case in chief" and

concluded that under rule 26(d)(4) Neurosurgeon 2's testimony "cannot be used in [Dierl's] case in chief[,] including to show proximate cause at summary judgment[,] unless [Dierl] can show that there was good cause for . . . the late disclosure of his opinions or that the late disclosure of his opinions was harmless to [Birkin]." The court found that Dierl had "not made either of those showings" and ruled Neurosurgeon 2's testimony inadmissible in Dierl's case-in-chief, stating, "[T]herefore, [it] cannot be used to fill the gap left in [Dierl's] case in chief by [Neurosurgeon 1's] deposition testimony."

¶13   "[T]aking all of that in[to] account," the court stated, it was "persuaded that [Birkin] has shown that [Dierl did] not have admissible evidence as part of [his] case in chief that the delay in diagnosis of . . . Dierl's brain tumor would have proximately caused any damage to . . . Dierl." So the court concluded that "based upon that lack of admissible evidence of an essential element," Dierl's claim "fail[ed] as a matter of law." Accordingly, the court granted summary judgment in Birkin's favor and dismissed Dierl's claim with prejudice.

ISSUES AND STANDARDS OF REVIEW

¶14   Dierl asserts that the district court erred in granting Birkin's motion for summary judgment. However, Dierl does not ask us to decide whether the district court's ultimate grant of summary judgment was erroneous, assuming both expert witnesses' affidavits were inadmissible. Instead, he presents two issues, both about the admissibility of the experts' affidavits.[4]

---

4. Dierl also states in the conclusion of his principal brief that the district court erred "in determining [that] increased surgical risk in this case is not a cognizable injury." However, he does not include this issue as presented for review, and his briefing on this

(continued…)

Therefore, the questions before us are really whether the expert witness affidavits were properly excluded—Neurosurgeon 1's for being inconsistent with his deposition testimony and therefore ineligible to create a genuine issue of material fact, and Neurosurgeon 2's for being barred from use in Dierl's case-in-chief because Neurosurgeon 2 was disclosed only as a rebuttal expert.

¶15   "Two different standards of review apply to [Dierl's] claims regarding the admissibility of evidence. The first standard of review, correctness, applies to the legal questions underlying the admissibility of evidence." *State v. Griffin*, 2016 UT 33, ¶ 14, 384 P.3d 186 (cleaned up). "The second standard of review, abuse of discretion, applies to the trial court's decision to admit or exclude evidence . . . ." *Id.*; *see also Murdock v. Springville Mun. Corp.*, 1999 UT 39, ¶ 25, 982 P.2d 65 (applying the abuse of discretion standard to a district court's decision rejecting affidavits). "Under the abuse of discretion standard, we will not reverse unless the decision exceeds the limits of reasonability." *Griffin*, 2016 UT 33, ¶ 14 (cleaned up).

---

point is cursory. We conclude that this argument is either not submitted for our review or is inadequately briefed because Dierl has "fail[ed] to provide any factual or legal basis to support [his] conclusory statement[]" and "has completely shifted the burden of researching the record and applicable law to the court" on this point. *See Jacob v. Cross*, 2012 UT App 190, ¶ 3, 283 P.3d 539 (per curiam). Therefore, we do not address this point. In any event, Dierl acknowledges that if we conclude that both affidavits were properly excluded, it would "effectively result[] in the [proper] dismissal of Dierl's medical malpractice lawsuit."

ANALYSIS

¶16     "If a defendant can show that the plaintiff has no legally sufficient evidentiary basis for its claims at trial, the defendant may establish the lack of a genuine issue of material fact and an entitlement to judgment as a matter of law." *Salo v. Tyler*, 2018 UT 7, ¶ 31, 417 P.3d 581. Furthermore, where the plaintiff bears the burden of proof at trial on the issue in question, a defendant "may make that showing without adducing any affirmative evidence of its own." *Id.*

¶17     For a prima facie case of "medical malpractice, a plaintiff must establish (1) the standard of care by which the physician's conduct is to be measured, (2) breach of that standard by the physician, (3) injury that was proximately caused by the physician's negligence, and (4) damages." *See Jensen v. IHC Hosps. Inc.*, 2003 UT 51, ¶ 96, 82 P.3d 1076 (cleaned up). Birkin asserted, and the district court agreed, that Dierl had not satisfied "the third element of medical malpractice—whether . . . Dierl's injury was proximately caused by . . . Birkin's purported negligence." "A plaintiff's failure to present evidence that, if believed by the trier of fact, would establish any one of the elements of the prima facie case justifies a grant of summary judgment to the defendant." *Niemela v. Imperial Mfg., Inc.*, 2011 UT App 333, ¶ 7, 263 P.3d 1191 (cleaned up).

¶18     To satisfy this element and survive Birkin's motion for summary judgment, Dierl needed to show that the alleged breach, "in the natural and continuous sequence (unbroken by an efficient intervening cause), produce[d] the injury" and that without it, "the result would not have occurred." *Arreguin-Leon v. Hadco Constr. LLC*, 2018 UT App 225, ¶ 30, 438 P.3d 25 (cleaned up), *aff'd*, 2020 UT 59, 472 P.3d 927. While "proximate cause is ordinarily a question of fact for the jury, summary judgment is appropriate . . . where the proximate cause of the injury is left to conjecture."

*Thurston v. Workers Comp. Fund*, 2003 UT App 438, ¶ 13, 83 P.3d 391 (cleaned up).

¶19　In medical malpractice cases, proximate cause is ordinarily established through expert testimony. *See Ruiz v. Killebrew*, 2020 UT 6, ¶ 11, 459 P.3d 1005 ("To ensure that the jury is not left to speculate, plaintiffs may not provide just any evidence of proximate cause: They must generally produce expert testimony that the medical professional's negligence proximately caused the plaintiff injury." (cleaned up)); *Nixdorf v. Hicken*, 612 P.2d 348, 354 n.17 (Utah 1980) ("The plaintiff also has the burden of proving the negligence of the defendant was the proximate cause of the injury. This proof requires some expert testimony in medical malpractice cases."). Accordingly, after the district court excluded the affidavits of both Neurosurgeon 1 and Neurosurgeon 2, it then ruled that Dierl did "not have admissible evidence . . . that the delay in diagnosis of [his] brain tumor would have proximately caused any damage." We review the district court's exclusion of each expert's affidavit in turn.

## I. Neurosurgeon 1's Affidavit

¶20　The district court excluded Neurosurgeon 1's affidavit on the basis that it contradicted his deposition testimony and therefore could not be used to raise a genuine issue of fact regarding causation. We agree.[5]

¶21　In *Webster v. Sill*, 675 P.2d 1170 (Utah 1983), a tenant sued a landlord after the tenant's toe was severed by a lawnmower

---

5. The case law on this point has sometimes used the language of a "sham affidavit." *See Blank v. Garff Enters. Inc.*, 2021 UT App 6, ¶ 6, 482 P.3d 258; *Uintah Basin Med. Center v. Hardy*, 2005 UT App 92, ¶ 6, 110 P.3d 168. We find such language to be ill-fitting because it implies pejorative intent that we do not feel is appropriate here.

when the tenant slipped while mowing the lawn. *Id.* at 1171. "On deposition, the [tenant] testified that when he started to mow, he was unaware that the grass was wet or damp," that "[h]e first concluded that the grass was wet and slippery only after he had spoken to [two other individuals] seven or eight days after the accident," and that these individuals "told the [tenant] that the grass had been watered the day of the accident." *Id.* at 1172. "On the basis of the [tenant's] deposition testimony, [the landlord] moved for summary judgment on the ground that the [tenant's] own admission established that there was no genuine issue of fact as to whether a dangerous condition existed which caused the accident." *Id.* "After the deposition, the [tenant] filed an affidavit that impliedly, if not directly, contradicted a critical part of his deposition," stating that an agent of the landlord "without [the tenant's] knowledge sprinkled a part of the lawn so that the lawn became wet and slippery," resulting "in the injury to the [tenant] in that the [tenant] slipped on the wet, slippery grass." *Id.* The court identified discrepancies between the tenant's deposition and affidavit as to when the tenant attributed the slip to the grass being wet and as to the timing and duration of the watering, concluding that the tenant's "theory of a dangerous condition [arose] from speculation based on what others told [him,] and that speculation was contrary to his deposition." *Id.* at 1173.

¶22 The court acknowledged that "[t]he purpose of summary judgment is not to weigh the evidence." *Id.* at 1172. But the court declared that "when a party takes a clear position in a deposition, that is not modified on cross-examination, [the party] may not thereafter raise an issue of fact by [its] own affidavit which contradicts [its] deposition unless [it] can provide an explanation of the discrepancy." *Id.* at 1172–73. The court noted that this rule "must be administered with care" as "[i]t is common knowledge that witnesses sometimes misstate themselves, may not properly understand the question propounded, or give equivocal answers." *Id.* at 1173. It also stated that this rule "does not apply

when there is some substantial likelihood that the deposition testimony was in error for reasons that appear in the deposition or the party-deponent is able to state in [an] affidavit an adequate explanation for the contradictory answer in [a] deposition." *Id.* However, finding that the tenant "testified in his deposition directly on the issue of causation" and gave an "answer [that] was clear and unequivocal that he did not notice that the grass was wet or slippery at the time of the accident," the court concluded that the tenant's "affidavit wholly failed to explain the discrepancy between the deposition and the affidavit," and thus there was no genuine issue of material fact and dismissal of the tenant's case was appropriate. *See id.*

¶23　Applying this reasoning to the expert testimony here, we reach a similar conclusion. In Neurosurgeon 1's deposition, Birkin's counsel asked whether Neurosurgeon 1 could "say, to a reasonable degree of medical probability, that had . . . Dierl undergone surgery in February of 2015, . . . he would not have the exact same injury to his vision today." And Neurosurgeon 1 responded, "No, because I would be—I would be speculating." Then Birkin's counsel asked whether Neurosurgeon 1 could "say, to a reasonable degree of medical probability, that . . . Dierl would not have experienced the exact same injury to his pituitary gland that he experienced following his surgery in December of 2015," and Neurosurgeon 1 again answered, "No." This directly contradicts the testimony in Neurosurgeon 1's affidavit "that due to the significant enlargement of the tumor from February 2015 to December 2015[,] . . . Dierl's vision loss was greater than it would have been if the surgery had been conducted in February or thereabouts instead of December 2015."

¶24　Dierl asserts that "there are some inconsistencies in the deposition itself" but that Neurosurgeon 1 did "state that the delay caused by Birkin's negligent failure to call out the brain tumor . . . cause[d] Dierl harm, increased risk of harm, increased his risk of permanent vision loss, etc." But Dierl does not provide

any statements from Neurosurgeon 1's deposition indicating that Dierl's actual injuries—as opposed to the risk of injuries—were caused by the delayed diagnosis. *Cf. Sohm v. Dixie Eye Center*, 2007 UT App 235, ¶ 21, 166 P.3d 614 ("Even if [the doctor's] affidavit contradicts his deposition testimony, which we do not think it does, the same inconsistencies existed within the deposition testimony itself." (cleaned up)). Accordingly, Neurosurgeon 1's affidavit contradicts his deposition testimony and cannot be used to raise a genuine issue of material fact unless "there is some substantial likelihood that the deposition testimony was in error for reasons that appear in the deposition or [Neurosurgeon 1 was] able to state in his affidavit an adequate explanation for the contradictory answer in his deposition." *See Webster*, 675 P.2d at 1173.

¶25 There is no "substantial likelihood that the deposition testimony was in error for reasons that appear in the deposition." *See id.* Like in *Webster*, Neurosurgeon 1 "testified in his deposition directly on the issue of causation" and gave an "answer [that] was clear and unequivocal." *See id.* The text of the deposition makes it clear that Neurosurgeon 1 understood the questions and that his position was that he could not state that Dierl would not have had the same injuries had the surgery been performed in February 2015.

¶26 And Neurosurgeon 1 did not provide "in his affidavit an adequate explanation for the contradictory answer in his deposition." *See id.* We have stated that "[w]e do not have to be persuaded by the explanation or even find it compelling," and "[a]s long as it is plausible, the fact finder should be allowed to weigh the credibility of the explanation." *Gaw v. Department of Transp.*, 798 P.2d 1130, 1141 (Utah Ct. App. 1990). But the only statement in the affidavit that seems to attempt to explain the discrepancy is one stating that "based only on a February 2015 CT brain scan [without] contrast showing a 20 mm size tumor, [Neurosurgeon 1] could not opine to any medical degree of

certainty or probability as to any injury . . . Dierl may have sustained from a craniotomy in February 2015." This does not adequately explain the discrepancy, as Neurosurgeon 1 does not state that his affidavit testimony was based on any additional information. Indeed, the record indicates that Neurosurgeon 1 had access to all the relevant medical files before his deposition. Dierl indicated in his designation of Neurosurgeon 1 as an expert witness that "[i]n forming his opinions on this matter, [Neurosurgeon 1] ha[d] reviewed and considered the relevant medical records," and Neurosurgeon 1 agreed that he had access to and reviewed "the documents, correspondence, and medical records related to . . . Dierl's [hospital] admission and treatment in February 2015" and the "medical treatment and medical records" related to Dierl's December craniotomy. Accordingly, and like in *Webster*, Neurosurgeon 1's "affidavit wholly failed to explain the discrepancy between the deposition and the affidavit." *See Webster*, 675 P.2d at 1173. Consequently, we conclude that the district court appropriately exercised its discretion in excluding Neurosurgeon 1's affidavit.

## II. Neurosurgeon 2's Affidavit

¶27    Dierl presents three arguments as to why Neurosurgeon 2's affidavit should not have been excluded. First, Dierl argues that the affidavit was improperly excluded under Rule 26 the Utah Rules of Civil Procedure. He asserts that rule 16 applies instead and that the affidavit is admissible under this rule. Second, Dierl argues that Neurosurgeon 2's testimony can be used as rebuttal evidence. Third, Dierl argues that the court erred in "granting Birkin's motion for summary judgment without addressing Dierl's . . . Rule 56 Motion." We address each argument in turn.

A.      Rules 16 and 26

¶28     Dierl first notes that the district court "determined that since [Neurosurgeon 2's] disclosure was late, it could not be used in Dierl's case-in-chief pursuant to . . . [r]ule 26(d)(4), unless Dierl could show that there was good cause for the late disclosure or the late disclosure was harmless," but he argues that "[r]ule 26(d)(4) on its face provides that only undisclosed witnesses are excluded and as [Neurosurgeon 2] was disclosed this [r]ule is inapplicable in this case." Dierl asserts that his late disclosure of Neurosurgeon 2 falls instead under rule 16, which permits sanctions if a party violates a judge's scheduling order. *See* Utah R. Civ. P. 16(d). And regarding rule 16, he asserts that the court "did not enter a scheduling order and therefore, Dierl did not disobey such an order by a late disclosure of [Neurosurgeon 2]."

¶29     Rule 16 of the Utah Rules of Civil Procedure indicates that "[i]f a party or a party's attorney fails to obey an order, . . . the court, upon motion or its own initiative, may take any action authorized by Rule 37(b)." *Id.* Rule 37(b) states that "the court, upon motion, may impose appropriate sanctions for the failure to follow its orders" and provides a list of such sanctions, which includes "dismiss[ing] all or part of the action, strik[ing] all or part of the pleadings, or render[ing] judgment by default on all or part of the action." *Id.* R. 37(b)(4). Here, however, rule 16 plays no role. As Dierl himself points out, there was no pretrial order in place upon which a violation could be based. Therefore, rule 16 is irrelevant to the issues presented in this case.

¶30     Rule 26 mandates that "[t]he party who bears the burden of proof on the issue for which expert testimony is offered must serve on the other parties the information required by paragraph (a)(4)(A) within 14 days after the close of fact discovery." *Id.* R. 26(a)(4)(C)(1). The rule indicates what information the party must serve regarding a witness "retained or specially employed to provide expert testimony in the case." *Id.* R. 26(a)(4)(A).

Subsection (d)(4) specifies that "[i]f a party fails to disclose or to supplement timely a disclosure or response to discovery, that party may not use the undisclosed witness, document, or material at any hearing or trial unless the failure is harmless or the party shows good cause for the failure." *Id.* R. 26(d)(4).

¶31    Dierl bore the burden of proof on his medical negligence claim, so he was responsible for satisfying the terms of rule 26 for his case-in-chief. Dierl disclosed Neurosurgeon 2, but he did so only as a rebuttal expert and only after Dierl's disclosures for his case-in-chief were due. So while Neurosurgeon 2 was eventually disclosed as a rebuttal witness, he was not timely disclosed as an expert for Dierl's case-in-chief, and Dierl's expert disclosures for his case-in-chief were not timely supplemented. In other words, Dierl's intended use of Neurosurgeon 2's testimony violates rule 26. Accordingly, the district court was correct that rule 26 presumptively barred the use of Neurosurgeon 2's testimony for Dierl's case-in-chief unless he made the necessary showing of harmlessness or good cause.

¶32    But Dierl disputes that he was required to show harmlessness, arguing that "[r]ule 26(d)(4) is clear on its face that if the 'failure is harmless' without any showing by Dierl, then the party may use the witness, document or material." However, this position is at odds with applicable case law. "Under a plain language reading of rule 26(d)(4), the burden to demonstrate harmlessness or good cause is clearly on the party seeking relief from disclosure requirements . . . ." *Keystone Ins. Agency, LLC v. Inside Ins., LLC*, 2019 UT 20, ¶ 18 n.7, 445 P.3d 434; *see also Vanlaningham v. Hart*, 2021 UT App 95, ¶ 20, 498 P.3d 27 ("As the party seeking relief from her rule 26 disclosure requirements, [the plaintiff] bears the burden to demonstrate harmlessness or good cause."); *Blank v. Garff Enters. Inc.*, 2021 UT App 6, ¶ 22, 482 P.3d 258 ("The failure to comply with the disclosure requirements of rule 26 . . . require[es] the exclusion of that evidence unless the [plaintiffs] show[] that their failure to disclose was either harmless

or excused by good cause."); Utah R. Civ. P. 26 advisory committee's notes to 2011 amendment ("If a party fails to disclose or to supplement timely its discovery responses, that party cannot use the undisclosed witness, document, or material at any hearing or trial, *absent proof that non-disclosure was harmless* or justified by good cause." (emphasis added)).

¶33    And this is for good reason. In *Blank v. Garff Enterprises Inc.*, 2021 UT App 6, 482 P.3d 258, we noted that "the orderly resolution of cases, particularly complex cases . . . , requires timely disclosure and the ability to rely on what has—and has not—been disclosed to chart out the next steps to move litigation to conclusion." *Id.* ¶ 23 (cleaned up); *see also* Utah R. Civ. P. 26 advisory committee's notes to 2011 amendment ("More complete disclosures increase the likelihood that the case will be resolved justly, speedily, and inexpensively. Not being able to use evidence that a party fails properly to disclose provides a powerful incentive to make complete disclosures. This is true only if trial courts hold parties to this standard. Accordingly, although a trial court retains discretion to determine how properly to address this issue in a given case, the usual and expected result should be exclusion of the evidence."). Parties rely on timely disclosures to "make better informed choices about the discovery they want to undertake or, just as important, what discovery they want to forgo." *RJW Media Inc. v. Heath*, 2017 UT App 34, ¶ 25, 392 P.3d 956.

¶34    Additionally, it is notable that Dierl's disclosure of Neurosurgeon 2 came after Birkin had filed his motion for summary judgment and after the hearing on that motion had been scheduled. We have noted that "allowing parties to disclose expert opinions that are central to a case only in response to a dispositive motion would seriously frustrate the orderly resolution of these kinds of cases." *Blank*, 2021 UT App 6, ¶ 23 (cleaned up). Like the defendant in *Blank*, Birkin "relied on the lack of expert testimony when [he] incurred the effort and

expense of preparing a motion for summary judgment on [Dierl's] claims." *Id.*; *see Segota v. Young 180 Co.*, 2020 UT App 105, ¶ 22, 470 P.3d 479 (concluding discovery violations were not harmless where they "caused the defendants to file and litigate motions, necessitating the expenditure of attorney fees and costs"). Dierl wants us to allow through the back door what should have been disclosed upfront, and permitting Dierl to use his rebuttal expert to establish an essential element of his prima facie case essentially renders rule 26's deadline for a plaintiff's expert disclosures meaningless. We decline to invite parties bearing the burden of proof to leave essential elements of their claims unsupported until after opposing parties have filed dispositive motions. Accordingly, we conclude that the district court properly exercised its discretion in ruling that Dierl violated rule 26 and could not use Neurosurgeon 2's testimony for his case-in-chief.

B.     Rebuttal Evidence

¶35     Dierl next argues that Neurosurgeon 2's testimony should be admitted as rebuttal evidence against Birkin's expert witness, who "opin[ed] generally no tumor growth between February 2015 and December 2015, thus concluding no harm to Dierl." Dierl asserts that "he did not and could not have anticipated the evidence [Neurosurgeon 2] disclosed for his rebuttal evidence; in particular that there was substantial growth of Dierl's brain tumor in the [cephalo-caudal] dimension" between February 2015 and December 2015. Dierl argues that this "evidence should not be excluded from rebuttal merely because it could have been made part of the case-in-chief."

¶36     But Dierl's argument here is misguided in several ways. First, the district court was not restricting what Neurosurgeon 2 would be able to testify on rebuttal, if the case were to proceed, but rather ruled that Neurosurgeon 2's testimony was not admissible in Dierl's case-in-chief. Second, and relatedly, the issue Dierl claims to rebut with Neurosurgeon 2's testimony is not the

dispositive issue. The district court dismissed the case because Dierl had not provided admissible evidence of causation. So Dierl's claim that Neurosurgeon 2's testimony rebutted Birkin's expert's opinion about "no tumor growth" is irrelevant to our inquiry. Dierl's case failed for lack of proof in the case-in-chief; in such a situation, there is nothing to rebut.

C.     Rule 56

¶37     Finally, Dierl argues that the district court should have admitted Neurosurgeon 2's affidavit under rule 56 of the Utah Rules of Civil Procedure. He also argues that the district court did not actually rule on his motion on this point.

¶38     Rule 56 states that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may" do any of the following: "(1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the moving party is entitled to it; or (4) issue any other appropriate order." Utah R. Civ. P. 56(e).

¶39     As to Dierl's argument that the district court erred in not admitting Neurosurgeon 2's testimony under rule 56, we are not persuaded. While rule 56 does indeed provide judges with discretion to "give [parties] an opportunity to properly support or address the fact," *id.*, the rule also provides other options for dealing with unsupported assertions of fact— including considering a fact undisputed and granting a motion for summary judgment. *See id.* The district court exercised its discretion in granting summary judgment, and for the reasons stated above, *see supra* ¶¶ 28–32, we conclude that this action was reasonable.

¶40 Furthermore, Dierl is incorrect that the district court failed to rule on his motion. First, because granting summary judgment is one of the options available under rule 56, the district court's grant of summary judgment was, in effect, a ruling on this motion. But even more clearly, the district court's order—titled "Order Granting Defendant's Motion for Summary Judgment and Denying Plaintiff's Motion to Support Factual Position"—states that the court heard argument on both matters, and it clearly issued a ruling on both matters. The transcript of the hearing further indicates that the court considered and ruled on Dierl's motion to admit Neurosurgeon 2's affidavit. Therefore, we are convinced that the district court ruled on Dierl's motion and that its decision was reasonable.

CONCLUSION

¶41 The district court properly exercised its discretion in excluding the affidavits of both experts. Neurosurgeon 1's affidavit contradicted his deposition testimony without explanation, so it cannot be used to create a genuine issue of material fact. And Neurosurgeon 2 was not disclosed as a witness for Dierl's case-in-chief, so his testimony was properly excluded from consideration in Dierl's case-in-chief. Accordingly, the district court correctly granted summary judgment for Birkin. We affirm.

———————