**2022 UT App 106**

## THE UTAH COURT OF APPEALS

LORI KATHRYN NELSON,
Appellant,

*v.*

15 WHITE BARN DRIVE LLC
AND JAMES HOUGHTALEN,
Appellees.

Opinion
No. 20210248-CA
Filed August 25, 2022

Second District Court, Ogden Department
The Honorable Ernest W. Jones
No. 190903147

Brad C. Smith, Attorney for Appellant

Howard Burt Ringwood and Spencer Wyatt Young,
Attorneys for Appellees

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUSTICE JILL M. POHLMAN and JUDGE RYAN M. HARRIS
concurred.[1]

CHRISTIANSEN FORSTER, Judge:

¶1      Lori Kathryn Nelson appeals the district court's grant of
summary judgment in favor of 15 White Barn Drive LLC (White

---

1. Justice Jill M. Pohlman began her work on this case as a judge
of the Utah Court of Appeals. She became a member of the Utah
Supreme Court thereafter and completed her work on this case
sitting by special assignment as authorized by law. *See generally*
Utah R. Jud. Admin. 3-108(4).

Barn) and James Houghtalen (collectively, the Defendants) on Nelson's claims of equitable mortgage and fraud.[2] We affirm.

## BACKGROUND[3]

¶2 Nelson owned certain real property (the Property) as trustee of her mother's trust. After her mother passed away, Nelson "was fearful of defaulting on the mortgage that existed at that time on the [P]roperty." The mortgage was approximately $36,000, and the Property was worth approximately $200,000. Nelson discussed her financial worries with her friend, James Houghtalen. He told her that although he did not have any money of his own to lend her, he "might know some private lenders."

¶3 According to Houghtalen, he tried to help Nelson find a lender but was unsuccessful because she was not employed. Houghtalen's wife (Wife) had the means to provide a loan, but when Houghtalen approached her about lending money to Nelson, she declined "because of [Nelson's] financial situation." However, Wife offered to purchase the Property for $55,000 so Nelson could pay off the mortgage and meet her other obligations. Wife formed White Barn to purchase the Property and gave Houghtalen a 1% interest in White Barn to facilitate the transaction.

---

2. Nelson's complaint also raised claims of quiet title and constructive trust, but she does not address the dismissal of those claims on appeal, and therefore, neither do we.

3. In reviewing the district court's grant of summary judgment, we view the facts "in the light most favorable to" Nelson, as "the nonmoving party." *See Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (quotation simplified).

¶4     Nelson believed that she had agreed to take a loan from White Barn and that she was obligated to pay off the $55,000 loan plus an additional "$10,000 as a good deed for [giving her] the loan," minus a credit for all rent payments White Barn received from leasing the Property. On the other hand, Houghtalen and Wife's understanding of the agreement was that White Barn would purchase the Property and then give Nelson the opportunity "to repurchase the home in two years at a predetermined price" of $65,000, less a partial rent credit of approximately $70 per month—the amount of equity Wife believed Nelson would have gained had she been paying on a loan. Wife explained that the parties initially anticipated that Nelson would live at the Property and pay rent, so they intended to put the option-to-purchase terms in a lease agreement separate from the sale agreement. According to Houghtalen and Wife, their goal was to allow Nelson to take "two years to get her act together and get a job and fix her credit" so that she could rebuy the Property.

¶5     Houghtalen did not tell Nelson that Wife was the person providing the funding for the transaction because Wife "wanted it to strictly be a business transaction" so that Nelson would take seriously the opportunity to buy back the Property and not see it as assistance from a friend. Houghtalen assured Nelson that White Barn would not attempt to sell the Property for two years.

¶6     Ultimately, Nelson decided not to reside at the Property, so the parties did not prepare a lease agreement. When Wife learned Nelson would not be living at the Property, she instructed Houghtalen to inform Nelson of changes she wanted to make to the agreement regarding the option to purchase, namely that Nelson would not be able to repurchase the Property sooner than two years after the transaction because Wife "wanted to make sure [she] could get a long-term [renter] in there" during that period. Nelson would then have from July 6, 2019, to September 1, 2019, "to purchase the Property from White Barn." Although

the rent credit the parties had discussed was initially based on Nelson paying rent, Wife told Houghtalen that she would agree to give Nelson the promised $70 rent credit even if White Barn rented the Property to someone else.

¶7     In July 2017, Nelson and White Barn, through Houghtalen, executed a real estate purchase contract (the REPC). The REPC stated, "Seller represents that Seller has fee title to the Property and will convey marketable title to the Property to Buyer at Closing by general warranty deed." The REPC further contained an integration clause, which stated that "the entire contract between the parties" consisted of "[t]he REPC together with its addenda, any attached exhibits, and Seller Disclosures" and that the contract "supersedes and replaces any and all prior negotiations, representations, warranties, understandings or contracts between the parties whether verbal or otherwise." Nelson also signed a warranty deed (the Warranty Deed) conveying title to the Property to White Barn. Neither the REPC nor the Warranty Deed contained any terms regarding an option for Nelson to purchase the Property or the amount of any rent credits she would receive, and the parties never executed a separate agreement memorializing any such terms.

¶8     According to Nelson, she "didn't know" the parties' agreement was to be "a purchase contract." Nelson recounted the following conversation that occurred right after she signed the REPC:

> [Houghtalen] says, "Well, you know you don't own the house anymore, . . . but look at the bright side, the new owner's going to have to pay for everything that happens to the house."
>
> I says, "What do you mean by that?"

He says, "Well, if the washer and dryer go bad, they're going to replace them. If the plumbing floods, they're going to have to fix it."

I said, "Well, I guess that's a plus, but it doesn't make me happy."

According to Nelson, that was the first time she realized she had sold the Property. Up until that point, she "thought it was a loan." She signed the REPC and the Warranty Deed without reading them because she "trusted" Houghtalen.

¶9 Nelson later sued the Defendants, raising claims of quiet title, equitable mortgage, constructive trust, and fraud. Nelson, Wife, and Houghtalen were all deposed, and the following exchange took place at Nelson's deposition:

Q. Okay. In your complaint, you have alleged that White Barn and Mr. Houghtalen have committed fraud. Do you recall making that complaint?

A. I don't recall using the word "fraud."

Q. Would you consider—as you sit here today, do you believe that the word—that the use of the word "fraud" is inappropriate?

A. I think it's a giant misunderstanding.

Q. Okay. You don't think anything was intentionally done?

A. No. I don't think he meant to hurt me.

Q. Okay. So you genuinely believe that they were trying to help you and that it was just a

> misunderstanding as to whether it was a purchase or whether it was a loan?
>
> A. Yes. I mean I knew nothing about his wife. It was just [Houghtalen] that I dealt with. And I don't think he meant to hurt me.

¶10 Nelson filed a motion for summary judgment, which the district court denied. The Defendants subsequently filed a motion for summary judgment, which the district court granted. With respect to Nelson's equitable mortgage claim, the district court determined that the written terms of the parties' REPC governed their agreement and that there was no basis to consider extrinsic evidence of the parties' intent. It accordingly granted the Defendants' motion for summary judgment on that claim. The court also granted summary judgment in favor of the Defendants on Nelson's fraud claim because it determined that Nelson "failed to provide any evidence to support her fraud claim."

¶11 The Defendants requested their attorney fees and costs on the ground that the REPC provided for such an award to the prevailing party. Nelson failed to respond to this motion, and the district court granted the request.

¶12 Nelson now appeals.

ISSUES AND STANDARD OF REVIEW

¶13 Nelson argues that the district court erred in granting the Defendants' motion for summary judgment on her equitable mortgage and fraud claims.[4] Summary judgment is appropriate

---

4. Nelson also challenges the district court's denial of her motion to strike affidavits submitted by the Defendants, which she claims

(continued…)

where "the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). Thus, in reviewing a motion for summary judgment, we must "review the district court's decision to ensure its legal conclusions were correct, and we must review the record to ensure no genuine and

---

contradicted Houghtalen's and Wife's testimonies in their depositions. *See generally Harnicher v. University of Utah Med. Center*, 962 P.2d 67, 71 (Utah 1998) ("The general rule is that in a summary judgment proceeding, when a party takes a clear position in a deposition, that is not modified on cross-examination, he may not thereafter raise an issue of fact by his own affidavit which contradicts his deposition, unless he can provide an explanation of the discrepancy." (quotation simplified)). However, Nelson does not identify any statements in the relevant affidavits that she alleges contradict the depositions or even cite those affidavits at all. Instead, she refers to statements in the Defendants' opposition to Nelson's motion for summary judgment in which they cited the affidavits and challenged Nelson's characterization of various statements in the depositions. Nelson then leaves it to us to review that pleading and cross-reference and compare the Defendants' explanations with the affidavits and the depositions. Because she has left to this court the burden of sifting through the record and crafting an argument, her argument is inadequately briefed. *See Allen v. Friel*, 2008 UT 56, ¶ 9, 194 P.3d 903 ("An appellate court is not a depository in which a party may dump the burden of argument and research." (quotation simplified)). We therefore decline to address its merits. *See Fuller v. Springville City*, 2015 UT App 177, ¶ 19, 355 P.3d 1063 ("It is well established that Utah appellate courts will not consider claims that are inadequately briefed." (quotation simplified)).

material factual disputes exist." *Shree Ganesh, LLC v. Weston Logan, Inc.*, 2021 UT 21, ¶ 13, 491 P.3d 885.

ANALYSIS

## I. Equitable Mortgage

¶14    Nelson first challenges the district court's grant of summary judgment in favor of the Defendants on Nelson's equitable mortgage claim. She argues that the court should have considered extrinsic evidence of the parties' intent with respect to the terms of the agreement between them and that, considering that evidence in the light most favorable to Nelson, an issue of fact existed regarding whether the REPC and the Warranty Deed should be construed as an equitable mortgage on the Property rather than an agreement to transfer title to the Property.

¶15    "[A] deed, absolute in form, may be construed as a mortgage if it is intended as security under a parol agreement rather than an outright conveyance." *Bown v. Loveland*, 678 P.2d 292, 297 (Utah 1984). But "when the transaction features not only a deed but also a contemporaneous written agreement stating the terms of the transaction . . . , the deed will be read in light of the written agreement and will be subject to the established rules of construction concerning such agreements." *Glauser Storage, LLC v. Smedley*, 2001 UT App 141, ¶ 20, 27 P.3d 565. "Thus, if a party claims a deed was intended as a mortgage, and no written agreement regarding the transaction exists, courts have no choice but to consider parol evidence to determine the parties' intent." *Id.* "On the other hand, if the parties entered into a written agreement at about the same time the deed was given, the court will look first to that agreement in its effort to decide what the parties intended." *Id.* And in that case, "[a]ny attempts to vary the unambiguous terms of the contemporaneous written agreement is subject to the parol evidence rule," which "operates . . . to

exclude evidence of contemporaneous conversations, representations, or statements offered for the purpose of varying or adding to the terms of an integrated contract." *Id.* ¶ 21 (quotation simplified).

¶16 Here, the Warranty Deed was accompanied by the REPC, which unambiguously demonstrated the parties' intent to enter into a purchase agreement rather than a mortgage. The REPC is titled "Real Estate Purchase Contract" and accordingly concerned a real estate purchase. It further provided that Nelson would "convey marketable title to the Property to [White Barn] at Closing by general warranty deed." There is no reasonable reading of this language that would allow the REPC or the Warranty Deed to be construed as creating a mortgage, and Nelson has suggested none. Accordingly, the parol evidence rule applies to preclude evidence of the parties' intent that contradicted the written agreement.

¶17 Nelson alternatively asserts that a court may consider parol evidence "in equity." To be sure, one exception to the parol evidence rule allows extrinsic evidence to be admissible in equity "where the contract is alleged to be a forgery, a joke, a sham, lacking in consideration, or where a contract is voidable for fraud, duress, mistake, or illegality." *Tangren Family Trust v. Tangren*, 2008 UT 20, ¶ 15, 182 P.3d 326. But while Nelson asserts that the contract was procured by fraud, she provided no evidence to support her fraud claim. *See infra* ¶¶ 21–23. Therefore, there was no equitable basis for the court to consider extrinsic evidence of the parties' intent.[5]

¶18 Finally, Nelson asserts that the court should consider parol evidence because she claims the REPC was "repudiated by every

---

5. Nelson did not raise claims of mutual mistake or reformation.

party."[6] But while Nelson asserts that this demonstrates that there was "no meeting of the minds" as to the REPC's terms, she has not identified any exception to the parol evidence rule that would allow us to consider extrinsic evidence. Instead, Nelson relies on *Webster v. JP Morgan Chase Bank, NA*, 2012 UT App 321, 290 P.3d 930, for the proposition that a plaintiff may be able to reasonably rely on contemporaneous oral representations even if those terms are not included in the contract or appear to be contradicted by the contract. *See id.* ¶¶ 6–13. But unlike Nelson, the plaintiff in *Webster* did not assert that the written contract was invalid due to the agreement's failure to reflect the oral representations; she merely sought to enforce the oral representations. *See id.* Here, Nelson has not raised any argument attempting to enforce the option to purchase that she claims was left out of the REPC.[7] Instead, she asks the court to treat the REPC as a mortgage because it did not contain additional terms she believes the parties agreed to. *Webster* does not support such a result.

¶19　It is unfortunate if Nelson failed to understand the effect of the agreement she signed, especially given the difference between the purchase price and the apparent value of the Property. But "in the context of contract formation, . . . each party has the burden to

---

6. Contrary to Nelson's characterization of Houghtalen's and Wife's testimonies, we see no evidence from which a reasonable jury could conclude that either of these individuals repudiated the terms of the REPC. Instead, both agreed that their intent was to allow Nelson an opportunity to repurchase the Property and to receive some credit for rent and that this agreement was never reduced to writing.

7. Nelson never asked the court to enforce any version of the option to purchase, and we are aware of no evidence suggesting that Nelson attempted to exercise the option to purchase or that the Defendants prevented her from doing so.

read and understand the terms of a contract before he or she affixes his or her signature to it." *McCleve Props., LLC v. D. Ray Hult Family Ltd. P'ship*, 2013 UT App 185, ¶ 12, 307 P.3d 650 (quotation simplified); *see also Oliphant v. Estate of Brunetti*, 2002 UT App 375, ¶¶ 20–21, 64 P.3d 587 (rejecting an argument that there was no meeting of the minds because one party "did not really know what she was signing"). Here, the terms of the REPC and the Warranty Deed were clear, and in such a situation, we must infer Nelson's intent from the terms to which she explicitly agreed. *See Allen v. Bissinger & Co.*, 219 P. 539, 541–42 (Utah 1923) ("The apparent mutual assent of the parties, essential to the formation of a contract, must be gathered from the language employed by them, and the law imputes to a person an intention corresponding to the reasonable meaning of its words and acts." (quotation simplified)); *see also Burningham v. Westgate Resorts, Ltd.*, 2013 UT App 244, ¶ 21, 317 P.3d 445 (explaining that where "the terms of the parties' agreement are contained in a written contract, . . . we look to that document to evaluate whether the parties reached the required meeting of the minds"). While her subjective intent and understanding may have been different, there is no basis to credit it over the express terms of the contract she signed. *See Glauser Storage*, 2001 UT App 141, ¶ 20 (explaining that our courts have a "pronounced preference for gleaning the parties' intent, whenever possible, from written agreements rather than from self-serving testimony"). Accordingly, we agree with the district court that the Defendants were entitled to summary judgment on Nelson's equitable mortgage claim.

## II. Fraud

¶20 Nelson next challenges the district court's grant of summary judgment in favor of the Defendants on her fraud claim. To prove fraud, Nelson had the burden of demonstrating nine elements:

(1) A representation; (2) concerning a presently existing material fact; (3) which was false; (4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that he had insufficient knowledge upon which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage.

*Carlton v. Brown*, 2014 UT 6, ¶ 37, 323 P.3d 571 (quotation simplified). Because Nelson would bear the burden of proving these elements at trial, the Defendants could establish that they were entitled to summary judgment on the fraud claim by demonstrating that Nelson had failed to present sufficient evidence in support of any one or more of these elements. *See Salo v. Tyler*, 2018 UT 7, ¶ 2, 417 P.3d 581 (explaining that where the nonmoving party "will bear the burden of production at trial . . . the moving party may carry its burden of persuasion" on a motion for summary judgment—"without putting on any evidence of its own—by showing that the nonmoving party has no evidence to support an essential element of a claim").

¶21   In support of her fraud claim, Nelson alleged in her complaint that Houghtalen made the following false representations:

> (a) That he would procure a private lender who would advance funds to [Nelson];
>
> (b) That the private lender was someone other than . . . Houghtalen;
>
> (c) That the private lender would advance funds in exchange for a fee of $10,000.00;

(d) That the private lender expected to be repaid and reconvey the [P]roperty in question to [Nelson];

(e) That . . . Houghtalen would provide a payoff upon request; and

(f) That by engaging in this course of dealing, [Nelson] could preserve and retain the [P]roperty, value in the [P]roperty, and its equity for herself and her use.

¶22 Except for the final representation on the list, Nelson has not pointed us to any evidence that Houghtalen misrepresented the terms of the parties' agreement; neither does a review of her deposition testimony reveal any such evidence. Nelson asserted during her deposition that Houghtalen told her he "might know some private lenders" and that he would "check with them." While she asserted that she signed the REPC and the Warranty Deed without reading them because she "trusted" Houghtalen, she did not recount her conversations with Houghtalen regarding the transaction with White Barn or what Houghtalen represented to her about that transaction. Instead, she discussed her personal understanding of the transaction: that she "thought it was a loan," that she believed she would "have to pay the [$]55,000 plus" "$10,000 as a good deed for doing the loan" within two years, and that she expected to get credit for any rent paid for the house in the meantime.

¶23 As to the final representation, there is evidence that both Houghtalen and Wife entered into the transaction with the intent to help Nelson get into a position to reclaim the Property. Specifically, both of them testified that White Barn, through Houghtalen, had agreed to give Nelson the opportunity to repurchase the Property after two years by paying White Barn $65,000 during a two-month window between July and

September 2019. But Nelson has not pointed to any evidence suggesting that any representations regarding Houghtalen's and White Barn's intent to help Nelson by allowing her to repurchase the Property were false. In fact, Nelson herself did not believe the Defendants committed fraud—she expressed during her deposition her belief that the incident was "a giant misunderstanding" and that Houghtalen did not mean to hurt her.

¶24    In the absence of any evidence of fraudulent statements, Nelson cannot meet her burden to establish her fraud claim. *See Salo*, 2018 UT 7, ¶ 2. Therefore, the district court did not err in granting summary judgment in favor of the Defendants.

### III. Attorney Fees

¶25    Nelson challenges the district court's award of attorney fees to the Defendants on the ground that the court erred in granting summary judgment in favor of the Defendants and that they were therefore not the prevailing parties. She also requests that she be awarded her fees based on Utah's reciprocal fees statute. Because we affirm the district court's ruling, we necessarily reject the premise of Nelson's argument. Accordingly, we affirm the district court's award of fees.

¶26    The Defendants request their fees and costs on appeal based on the terms of the REPC. Because the Defendants were awarded their fees below and they have prevailed on appeal, we grant their request for attorney fees and costs incurred on appeal. *See Wing v. Code*, 2016 UT App 230, ¶ 27, 387 P.3d 601 ("When under a contractual fee provision a party is entitled to attorney fees below and prevails on appeal, that party is also entitled to fees reasonably incurred on appeal." (quotation simplified)).

CONCLUSION

¶27 The district court did not err in granting summary judgment in favor of the Defendants on Nelson's equitable mortgage and fraud claims. The court could not consider parol evidence to vary the terms of the parties' written REPC, and Nelson failed to present sufficient evidence of fraud. Moreover, the court did not err in awarding attorney fees in favor of the Defendants. Accordingly, we affirm and remand for the district court to calculate the Defendants' attorney fees incurred on appeal.

———