**2024 UT App 176**

# THE UTAH COURT OF APPEALS

KRISTEN E. CAPOZZOLI, ET AL.,*
Appellees,
*v.*
CORALE C. MADDEN,
Appellant.

Opinion
No. 20230188-CA
Filed December 5, 2024

Third District Court, Salt Lake Department
The Honorable Richard D. McKelvie
No. 200905204

Dennis M. Holmgren and Jake Hinkins,
Attorneys for Appellant

T Carter Maudsley, Attorney for Appellees

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES GREGORY K. ORME and JOHN D. LUTHY concurred.

TENNEY, Judge:

¶1    In the summer of 2020, Kristen Capozzoli purchased a house from Corale Madden. After signing the Real Estate Purchase Contract (REPC), Capozzoli discovered that a leak had caused water damage to several rooms in the house. When Madden refused to pay the repair costs, Capozzoli sued Madden for breach of contract. In response, Madden filed counterclaims for fraud and negligent misrepresentation against Capozzoli, claiming that Capozzoli had lied to Madden in a letter she wrote asking Madden to sell the house to her. In conjunction with the

---

* Additional Appellees include the third-party defendants Gerrit Capozzoli (also known as Gerrit Bursma), Staci Carlston, and Summit Sotheby's Realty.

counterclaims, Madden also filed third-party claims against Capozzoli's husband, real estate agent, and brokerage.

¶2 The district court granted Capozzoli's motion to dismiss Madden's counterclaims and third-party claims. After Madden stipulated to liability on the breach of contract claims, the court held a bench trial on the question of damages. At the close of trial, the court awarded Capozzoli most of her requested damages. The court also concluded that Capozzoli was the prevailing party, so it granted her request for attorney fees.

¶3 Madden raises three issues on appeal. For the reasons set forth below, we:

- affirm the damages award that the district court entered on Capozzoli's breach of contract claim;

- reverse the district court's dismissal of Madden's counterclaims and third-party claims; and

- vacate the district court's award of attorney fees.

BACKGROUND

*The Water Damage and Restoration Estimate*

¶4 When Madden's mother passed away in 2019, Madden inherited the house (the House) that her mother had owned in Midvale, Utah. Madden's aunt lived in the House until the next year, at which point Madden decided to sell it.

¶5 Within a short time of listing the House for sale, Madden received "[a]bout six" offers. One was from Capozzoli, and that offer included a personal letter (the Letter) in which Capozzoli encouraged Madden to accept her offer over others. In the Letter, Capozzoli wrote, on behalf of herself and her husband (Husband):

We don't just want to buy a house. We're trying to build a home. We are asking you to consider our offer and not only the love we have for each other but the love that we will fill this home with. We want to open up the kitchen so that the living room and kitchen feel like one; the center of our home. A place where we can entertain our family and catch our kids sneaking snacks after bedtime. We want [to] build a garden in the back yard so my little girl can help me play in the dirt as I did with my mom growing up. We want to put a big couch in front of the living room window so that our dogs can watch the world go by. Downstairs, we want to open the fireplace that has been sheet rocked over so on cold winter days we can all cuddle up and watch movies in a pile of kids and dogs and blankets.[1]

¶6 Madden accepted Capozzoli's offer. According to the allegations Madden later made in her counterclaim, Madden was persuaded to do so by the Letter. More specifically, Madden alleged that it mattered to her that Capozzoli wrote that she and Husband "were going to renovate and make [the House] their own," because Madden wanted to sell the House "as is."

¶7 The parties eventually agreed to and signed the REPC. That agreement obligated Madden to deliver the House to

---

1. The Letter uses the pronoun "we" to refer to Capozzoli and Husband, but there are indications that Capozzoli was primarily responsible for writing the Letter. As will be explained below, Madden ultimately sued both Capozzoli and Husband for the statements made in the Letter. For ease of reference, we'll nevertheless refer to the Letter as if Capozzoli wrote it on behalf of both herself and Husband. We also note that Husband was not a signatory to the ensuing REPC, nor was he a plaintiff in the initial complaint that Capozzoli filed below.

Capozzoli "in substantially the same general condition as it was on the date of [a]cceptance." It also provided that "[i]n the event of litigation or binding arbitration arising out of the transaction contemplated by the REPC, the prevailing party shall be entitled to costs and reasonable attorney fees."

¶8      About a week and a half after Capozzoli signed the REPC, Capozzoli had the House inspected. The inspection report listed several items that needed repair, including the water heater. Madden soon agreed to some concessions, mostly relating to an issue that was discovered with the electrical panel, but she did not agree to cover the cost of a new water heater.

¶9      Capozzoli did not attend the final walk-through of the House before closing. But Capozzoli did check in with her real estate agent (Agent), who had attended the final walk-through. Agent informed Capozzoli that there was "a small leak," that Madden had "a handyman coming out," and "that it would be covered and taken care of by [Madden]."

¶10     On July 14, 2020, Capozzoli signed the closing documents. Later that day, Agent notified Capozzoli that the "damage was substantially worse" than they had expected and advised her "to withhold on recordings." Capozzoli and Husband went to the House "to see what was going on." At the House, they found "saturated bath towels" in the laundry room and basement, "a soft spot in front of the pantry" where "the subfloor was basically starting to give way," "splintering" and "bowing" in the wood flooring in the spare bedroom, and remnants of an eight-to-ten-foot puddle in the basement utility room. The district court later found that "[s]ometime between the date the contract was completed and the date of closing, [Madden's] aunt removed the washer and dryer from the home, and in the process apparently left a supply hose to the washer partially open, creating a leak," thus causing "substantial damage."

¶11　On July 15, Capozzoli authorized the release of funds and completed the closing, despite being told that she could delay funding. Capozzoli later explained that she chose to move forward based on assurances from both parties' agents that Madden would "absolutely" cover the damage, as well as her own concerns about potentially losing her earnest money and being sued for breach of contract if she did not complete the closing.

¶12　By this point, Capozzoli had already hired a restoration company (the Restoration Company), and an estimator (the Estimator) from the Restoration Company met her at the House that same day to assess the damage. Using a moisture meter, the Estimator detected water in the floors and walls in and around the laundry room, the pantry, a hallway, a bedroom, and the basement utility room. The Estimator gave Capozzoli a bid for what he thought was the necessary mitigation and restoration work, which totaled $8,655.48. The bid included costs for labor and materials, including installing new tile in the laundry room, sanding and refinishing the damaged wood in the bedroom, and replacing the contiguous flooring on the main level of the House. The bid also included the cost of a new water heater ($1,135.41), which was added to the bid after Husband tried to shower and discovered it wasn't working.

¶13　Concerned about their ability to live in the House while the repairs were being done, Capozzoli and Husband went back to the duplex that they had been living in and spoke with their landlord. The landlord told them that he would keep their security deposit and that they could stay as long as needed.

¶14　At this point, Capozzoli realized that it "was not going to be as simple as [Madden] filing an insurance claim," so she asked the Restoration Company to stop further mitigation and restoration work. Capozzoli paid the Restoration Company $1,511.83 for the mitigation work it had already done to dry out

the water. Capozzoli then asked Madden to pay the full amount that the Restoration Company had estimated it would cost to repair the damages—$8,655.48. Madden refused to do so.

*Capozzoli's Suit and the Dismissal of Madden's Counterclaims*

¶15    Capozzoli sued Madden for breach of contract. Capozzoli requested damages relating to the repair costs to the House, the loss of use of the House, and the utilities paid while the House was uninhabitable. Capozzoli also requested her attorney fees.

¶16    Madden answered the complaint. As part of her answer, Madden also filed counterclaims against Capozzoli, as well as identical third-party causes of action against Husband, for fraud and negligent misrepresentation, alleging that they had "represented" to Madden that they "intended to make major renovations to the [House]," that they "knew that their representations were false," and that Madden "rel[ied] upon the representation without knowledge of its falsity." Madden also filed third-party complaints against Agent and her brokerage for negligence and vicarious liability. Madden alleged that Agent "breached her duties" "to be honest, ethical and comparable" by being "careless or negligent in connection with the communication and transmission of the [Letter] or failure to communicate [Capozzoli and Husband's] true intent." Madden alleged that because Agent was employed by brokerage, the brokerage was "liable for all of the acts and conduct of [Agent]."

¶17    The counterclaim and third-party defendants (i.e., Capozzoli, Husband, Agent, and the brokerage) later filed a joint motion to dismiss Madden's claims under rule 12(b)(6) of the Utah Rules of Civil Procedure, arguing that Madden had failed to state a claim upon which relief could be granted on any of her claims. On the fraud claims against Capozzoli and Husband, they argued that the alleged conduct did not amount to fraud because

Madden could not show that Capozzoli's statements in the Letter "were made concerning a presently existing fact." On the negligent misrepresentation claim, they argued it was barred by the merger doctrine. Finally, they argued that the negligence and vicarious liability claims against Agent and the brokerage failed because the claims were dependent on the negligent misrepresentation claims that, in their view, also failed as a matter of law.

¶18 After receiving an opposition from Madden, the district court issued a written decision granting the motion to dismiss. The court ruled that the statements that Capozzoli (and, arguably, Husband) made in the Letter "were not promises of any future performance that could be relied upon by Madden" and likewise "were not representations that could be relied upon by Madden." For this reason, the court ruled that the fraud and negligent misrepresentation claims both failed as a matter of law. The court then ruled that, "[b]ecause the statements transmitted to Madden" by Agent were "not actionable," Agent's "actions were not negligent," so "Madden's cause of action against [Agent] fail[ed] as a matter of law." For similar reasons, the court ruled that there was no basis for imposing vicarious liability on the brokerage.

*The Damages Trial and Award*

¶19 A few months later, Capozzoli filed a motion for partial summary judgment on her breach of contract claim. Shortly thereafter, the parties stipulated that Madden had breached the REPC. The only issue left for trial was damages.

¶20 At a subsequent bench trial on the question of damages, Capozzoli sought four types of damages:

- $1,511.83 for the mitigation work already performed by the Restoration Company and paid for by Capozzoli;

- $10,918.44 for the Restoration Company's unperformed bid prepared by the Estimator;[2]

- $1,000 for the rent she paid while the House was, in her view, uninhabitable; and

- "costs and reasonable attorney fees" contemplated by the REPC.

¶21 Although the Restoration Company had not performed the work detailed in the bid by the time of trial, Capozzoli acknowledged in her testimony that she and Husband had done some work on the House themselves in the meantime—namely, repainting walls and replacing flooring. But she insisted that this work was merely "a temporary Band-Aid" to make the House livable in the short term and that this work was not intended to be "in lieu of" the long-term restoration work detailed in the Restoration Company's bid.

¶22 Capozzoli and the Estimator also each testified about the work that would be needed to return the House to the condition it was in at the time of acceptance, including sanding and refinishing the hardwood flooring in the spare bedroom; installing new flooring in the hallway, pantry, and laundry room; removing and replacing the drywall in the laundry room; and replacing the contiguous laminate flooring in the main level of the house to ensure it matched.

¶23 In her arguments to the court, Madden did not object to Capozzoli's request for $1,511.83 in damages relating to the

---

2. This amount differs from the amount given in the initial estimate that we previously noted in paragraph 12. While the record is somewhat unclear on this point, it appears that Capozzoli had received a higher bid from the Restoration Company in the interim and sought damages reflective of that higher amount.

Restoration Company's "actual work" in mitigating the water damage. Madden did, however, object to the rest of the requested damages. She agreed that the costs to sand and refinish the wood floor in the spare bedroom, which constituted $620.10, would qualify as restoration, but she argued that Capozzoli had not carried her burden of showing that such measures were necessary. Madden also objected to damages related to a new water heater, as well as damages for new flooring throughout the kitchen and living room because it was more akin to renovation than restoration. And Madden further argued that Capozzoli had failed to satisfy her burden of proof as to the amount requested for rent reimbursement.

¶24    The district court subsequently issued a written decision in which it awarded Capozzoli $9,031.90 in damages. The court awarded damages for the previously performed mitigation work and the unperformed restoration bid. But it did not award damages for the new water heater ($1,135.41), concluding that the original one had "exceeded its life expectancy" anyway and noting that this had been "brought to the attention of the parties during the home inspection." The court also did not order damages for the cost of rent reimbursement ($1,000), concluding that Capozzoli "did not bear her burden of proving that the duration was consistent with the amount of time [that] mere restoration, as opposed to remodeling would have taken." Finally, the court ordered Madden to pay $19,797.55 in attorney fees, concluding that Capozzoli was the prevailing party in the case.[3]

---

3. In her post-trial filings, Capozzoli requested $19,797.55 in fees, and in her reply to an opposition from Madden, Capozzoli explained that this amount did not include any fees incurred on behalf of Agent or the brokerage. Though a touch unclear, there's also no indication that Capozzoli's request included fees incurred defending Husband against the third-party claims that Madden

(continued…)

ISSUES AND STANDARDS OF REVIEW

¶25 Madden raises three issues on appeal. First, Madden argues that the evidence was insufficient to support the district court's damages award. In furtherance of this claim, Madden challenges several of the district court's factual findings as being clearly erroneous. "When reviewing a challenge to the sufficiency of the evidence, we will not set aside a trial court's factual findings unless clearly erroneous, giving due regard to the trial court's opportunity to judge the credibility of the witnesses." *Shuman v. Shuman*, 2017 UT App 192, ¶ 3, 406 P.3d 258 (quotation simplified). A finding is clearly erroneous when it is "against the clear weight of the evidence" or otherwise leaves us with a "firm conviction that a mistake has been made." *Lundahl Farms LLC v. Nielsen*, 2021 UT App 146, ¶ 40, 504 P.3d 735 (quotation simplified). "But a finding is not clearly erroneous if, viewing the evidence in the light most favorable to the trial court's findings, the evidence is legally sufficient to support the finding." *Id.* (quotation simplified).

¶26 Second, Madden argues that the district court erred in dismissing her counterclaims and third-party claims. "We review a decision granting a motion to dismiss for correctness, granting no deference to the decision of the district court." *Miller v. Miller*, 2020 UT App 171, ¶ 10, 480 P.3d 341 (quotation simplified). "We likewise review the district court's subsidiary legal determinations for correctness." *Id.* (quotation simplified).

¶27 Finally, Madden claims that the district court erred in awarding Capozzoli attorney fees. "Whether the district court applied the correct legal standard is a question of law, which we review for correctness. But whether a party is the prevailing party in an action is a decision left to the sound discretion of the trial

brought against him. As noted, the district court awarded Capozzoli the exact amount she requested.

court and reviewed for an abuse of discretion." *Wihongi v. Catania SFH LLC*, 2020 UT App 109, ¶ 7, 472 P.3d 308 (quotation simplified).

## ANALYSIS

### I. Damages Award

¶28 Under the REPC, Madden was obligated to provide Capozzoli with a house that was "in substantially the same general condition as it was on the date of [a]cceptance." Because Madden stipulated that she had breached that provision of the REPC, the question presented to the court in the damages trial was how much it would cost to restore the House to that condition. After hearing the evidence, the court awarded Capozzoli $9,031.90 in damages. Madden now challenges that award, claiming there was insufficient evidence to support it. We disagree with Madden's arguments.

¶29 As noted, "we will not reverse a finding made by the trial court unless it is clearly erroneous," meaning it is "against the clear weight of the evidence" or otherwise convinces us "that a mistake has been made." *Lundahl Farms LLC v. Nielsen*, 2021 UT App 146, ¶ 40, 504 P.3d 735 (quotation simplified); *see also* Utah R. Civ. P. 52(a)(4). In past cases, our courts have held that a district court can rely on estimates in awarding damages if the estimate is "the most direct, practical and accurate method that can be employed." *Traco Steel Erectors, Inc. v. Comtrol, Inc.*, 2009 UT 81, ¶ 24, 222 P.3d 1164 (quotation simplified); *see also Hale v. Big H Constr., Inc.*, 2012 UT App 283, ¶ 24, 288 P.3d 1046 (rejecting a plaintiff's challenge to a defendant's "use of estimates and averages" to establish damages in light of *Traco*).

¶30 Here, the damages award was supported by the testimonies of both Capozzoli and the Estimator. From these witnesses, the district court heard evidence that the following

work needed to be done to restore the House to its original condition:

- the flooring in the bedroom needed to be sanded and refinished;

- new flooring was needed in the hallway, pantry, and laundry room;

- the contiguous laminate flooring on the main level of the House needed to be replaced to ensure it all matched, and the court further heard that this practice is consistent with "insurance protocols"; and

- the drywall in the laundry room needed to be removed and replaced.

The court heard evidence that the Restoration Company estimated that the above work would cost $7,520.07 to perform.[4] Separate from this restoration work, the court also heard that Capozzoli had paid $1,511.83 to the Restoration Company for the mitigation work that it had completed to dry out the water. As a result, it had a basis for awarding $9,031.90 in damages.

¶31 Despite this evidence, Madden offers three principal arguments for why she believes the evidence was insufficient to support the district court's damages award. We find none of them persuasive.

¶32 First, Madden argues that two of the subsidiary findings that the court made in its ruling were clearly erroneous—namely, that (i) the damage was "primarily to the kitchen" and (ii) the House was rendered "uninhabitable" by the water damage. In

---

4. As noted, the initial estimate was for $8,655.48, but this included $1,135.41 for the water heater, which the court declined to include in its damages award.

Madden's view, these were "foundational facts." Because of this, Madden argues that the court's entire damages ruling should be invalidated.

¶33   Having carefully reviewed the record and the district court's ruling, it's somewhat unclear to us why the court wrote that the damage was "primarily to the kitchen." After all, the court heard detailed evidence about the nature of the damage, that evidence cataloged damage that was done throughout the House on a room-by-room basis, and that evidence demonstrated that most of the damage was done to other rooms. In light of this, it seems that the word "primarily" was something of a stray adjective. But under well-accepted harmless error standards, we don't reverse rulings unless there is a "reasonable likelihood that the error affected the outcome of the proceedings." *Covey v. Covey*, 2003 UT App 380, ¶ 21, 80 P.3d 553 (quotation simplified). And here, in light of the specific evidence presented at trial about the various places in the House that were damaged, we see no basis for concluding that this particular adjective was "foundational" to the court's decision, much less that this word provides reason to invalidate the court's overall damages award.

¶34   We reach a similar conclusion with respect to the court's finding that the damage rendered the House "uninhabitable." On appeal, the parties dispute whether the water damage actually did render the House uninhabitable. But we have no need to decide whether the court's conclusion was unsupportable. As noted, the district court rejected Capozzoli's request for rent reimbursement as part of the damages award. As a result, it seems that this finding had no impact on that award, and Madden therefore has not persuaded us that the alleged problems with this particular finding provide any basis for invalidating it.

¶35   Second, Madden argues that because Capozzoli testified that she and Husband had repaired some of the damage to the House themselves, and because Capozzoli failed to provide an

amount of the costs they incurred in conjunction with that work, the damages awarded for restoration should be vacated. But Capozzoli insisted several times in her testimony that the work that she and Husband did was merely "a temporary Band-Aid" and that it was not intended to be "in lieu of" the work detailed in the Restoration Company's bid. Further expounding on this, she explained:

> I love my husband very much, but he is an inexperienced handyman laying down a very cheap flooring, and he did a very subpar job. So that cheap flooring is already peeling up and falling apart, and it was — it was definitely a Band-Aid at the end of its life.

The district court appears to have credited Capozzoli's testimony. Given this testimony, the court thus had a sufficient evidentiary basis for ordering damages based on the Restoration Company's bid, as opposed to limiting the damages to the expenses incurred by Capozzoli and Husband.

¶36   Third, Madden argues that the district court erred in finding Capozzoli's testimony credible. In support of this argument, Madden points to a relatively small number of inconsistencies—both within Capozzoli's testimony, as well as between Capozzoli's testimony and other evidence presented at trial. "But it is the province of the trier of fact to assess the credibility of witnesses, and we will not second-guess the trial court where there is a reasonable basis to support its findings." *Merrill v. Merrill*, 2024 UT App 125, ¶ 37, 556 P.3d 1070 (quotation simplified). Moreover, the presence of "contradictory evidence is generally not sufficient to overturn a verdict, because the factfinder determines which evidence to believe when conflicting evidence is presented." *Layton City v. Carr*, 2014 UT App 227, ¶ 10, 336 P.3d 587. And when a district court evaluates witness credibility in a bench trial, the "mere existence of inconsistencies

is not a sufficient basis to question credibility determinations." *State v. Davie*, 2011 UT App 380, ¶ 20, 264 P.3d 770.

¶37 We've reviewed both Madden's arguments and the record regarding the inconsistencies in question. In our view, the alleged inconsistencies were all about relatively minor or peripheral issues, and some of them were explainable anyway by the two-year gap between the events in question and the trial. Regardless, even with these issues, there was still a reasonable basis for the district court to find Capozzoli's testimony about the sequence of events and the overall damages to be credible. Madden therefore has not persuaded us that these inconsistencies were such that the court was required to disregard Capozzoli's testimony.

¶38 In short, we are not persuaded that any of the findings Madden challenges on appeal are either clearly erroneous or prejudicial in nature. We therefore conclude that there was sufficient evidence to support the damages award.

## II. Counterclaims and Third-Party Claims

¶39 As indicated, Madden brought counterclaims for fraud and negligent misrepresentation against Capozzoli, as well as identical third-party claims against Husband. Madden also brought third-party claims against Agent and her brokerage for negligence and vicarious liability, with those claims largely hinging on the claims asserted against Capozzoli and Husband.

¶40 The elements of fraud are:

> (1) a representation; (2) concerning a presently existing material fact; (3) which was false; (4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that [the representor] had insufficient knowledge upon which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party,

> acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to [the other party's] injury and damage.

*Larsen v. Exclusive Cars, Inc.*, 2004 UT App 259, ¶ 7, 97 P.3d 714 (quotation simplified). The "elements of negligent misrepresentation are similar to those of fraud except that negligent misrepresentation does not require the intentional mental state necessary to establish fraud." *Shah v. Intermountain Healthcare, Inc.*, 2013 UT App 261, ¶ 11, 314 P.3d 1079 (quotation simplified).

¶41    As noted, the district court dismissed those claims pursuant to rule 12(b)(6) of the Utah Rules of Civil Procedure. But because it was reviewing the claims under the rule 12(b)(6) standard, the court was required to "take the factual allegations in the complaint as true." *1600 Barberry Lane 8 LLC v. Cottonwood Residential O.P. LP*, 2021 UT 15, ¶ 43, 493 P.3d 580. And it could only grant the motion if, "assuming the truth of the allegations in the complaint and drawing all reasonable inferences therefrom in the light most favorable to" Madden, it was "clear" that Madden was not entitled to relief. *Hudgens v. Prosper, Inc.*, 2010 UT 68, ¶ 14, 243 P.3d 1275 (quotation simplified).

¶42     In its ruling, the court concluded that the statements Capozzoli made in the Letter "were not promises of any future performance" and "were not representations that could be relied upon by Madden." We understand this ruling to have been based on the first and second elements of fraud. But to satisfy those elements, the statements didn't need to be "promises of any future performance." Instead, as noted, it was enough if they constituted representations of "presently existing material fact." *Larsen*, 2004 UT App 259, ¶ 7 (quotation simplified).

¶43    In her counterclaims and third-party claims, Madden alleged that Capozzoli and Husband:

- "represented that they intended to make extensive renovations to the [House]";

- "identif[ied] the specific renovations to the [House] they purportedly intended to make";

- did so "[k]nowing they would most likely not be submitting the highest offer";

- did so "with the intent to induce Madden to accept the [offer]"; and

- "did not actually intend to make the renovations . . . or are so contending after the fact and they knew that their representations were false."

As framed by these allegations, it seems that the "presently existing material fact" at issue was the intention that Capozzoli and Husband had for the House as of the time that Capozzoli wrote the Letter. In the passages from the claims recited above, Madden plainly alleged that Capozzoli made statements about these intentions and that those statements were false. Madden alleged that she "did in fact reasonably rely upon the representation without knowledge of its falsity." Madden further alleged that, because of these statements, she "was induced to accept" Capozzoli's offer over other more lucrative offers. And as noted, because of the procedural posture, the district court was required to accept these allegations as true. As a result, insofar as the district court's ruling was based on its conclusion that there were no statements of presently existing material fact, we conclude that the court was mistaken on that point.

¶44 In response to Madden's arguments, Capozzoli tells us that letters like this one are somewhat common in competitive real estate markets. We're also told that such letters sometimes include flowery language or even puffery. Fair enough. And for similar reasons, the district court seems to have concluded that, as a

matter of law, statements made in such letters simply cannot support the initial elements of a fraud claim—i.e., that they cannot be regarded as statements of presently existing fact. But neither the district court nor Capozzoli have pointed us to any authority holding that such letters are categorically exempt from prohibitions against fraud. And since the ostensible point of such a letter is to induce an owner to sell a seemingly valuable home or property to a particular buyer, it's not hard to imagine scenarios in which a particular statement made in such a letter could be the thing that induces an owner to pick one buyer over another. If it turns out that a statement was specific enough (not to mention verifiably false enough), we see no reason why such statements could not form the basis of a fraud claim. Thus, to the extent that the district court ruled that the initial fraud elements could not be satisfied, we conclude that the decision was erroneous and must be reversed.[5]

¶45 To be clear, and as we just noted, our understanding is that the district court's ruling was based solely on its conclusion that the initial elements of fraud could not be satisfied, and we're reversing the decision based on that understanding. But we note that our decision still leaves open many questions that are yet to be decided, whether on summary judgment or after a trial. For example, Capozzoli questions whether Madden can prove that it was reasonable for her to rely on the particular statements Capozzoli made in the Letter. We note that in assessing reasonable reliance, a factfinder is entitled to consider the context

---

5. In a similar vein, Capozzoli argues on appeal that the statements she made in the Letter were not factual at all because they were merely "aspirational" and expressions of "wants" or "hopes for the future." But in the Letter, Capozzoli made specific claims about specific intentions. And in the counterclaim, Madden at least alleged that Capozzoli did not actually have those intentions, which is enough to survive the motion to dismiss.

of the statements at issue (including their tone and tenor), what was said and what was not said, the kind of communication at issue, and any other relevant circumstances. *See Robinson v. Tripco Inv., Inc.*, 2000 UT App 200, ¶ 20, 21 P.3d 219 ("To determine whether the reliance was reasonable, the reliance must be considered with reference to the facts of each case." (quotation simplified)). And in this sense, it seems possible that some of the concerns that the court expressed with respect to the "representation" and "presently existing fact" elements might find more solid footing in a reasonable-reliance analysis.

¶46 In addition, there may be some question about whether Madden can prove that the statements were false. After all, Capozzoli asserts that she did have the intention to renovate the House at the time she wrote the Letter. And some of the evidence presented at the damages trial seems to back that up. For example, Madden's own evidence showed Capozzoli began renovating the kitchen fairly quickly, which may undermine any claim that the statements at issue were false.

¶47 But again, the district court dismissed Madden's claims under rule 12(b)(6) of the Utah Rules of Civil Procedure, and it did so based on its assessment of the initial elements of fraud. Because we reverse that conclusion, and because the court has not yet entered a ruling, much less findings, on the other elements, we have no occasion to address the merits of these additional potential issues. Thus, while we reverse the dismissal of Madden's claims, we leave open the parties' ability to raise additional arguments about those claims on remand.

## III. Attorney Fees

¶48 Finally, Madden challenges the district court's award of attorney fees to Capozzoli. "In Utah, attorney fees are awarded only if authorized by statute or contract. If provided for by contract, attorney fees are awarded in accordance with the terms of the contract." *Eldridge v. Farnsworth*, 2007 UT App 243, ¶ 51, 166

P.3d 639 (quotation simplified). Here, the REPC stated that in "the event of litigation or binding arbitration arising out of the transaction contemplated by the REPC, the prevailing party shall be entitled to costs and reasonable attorney fees."

¶49    The district court awarded attorney fees to Capozzoli based on its determination that she was the prevailing party. But because that award was based, in part, on its dismissal of Madden's counterclaims, and because we've now reversed that dismissal, the prevailing party calculus needs to be reevaluated. *See Harman v. 105 Partners, LLC*, 2024 UT App 109, ¶ 61 n.16, 556 P.3d 669 (vacating an attorney fee award after reversing dismissal of two claims). We accordingly vacate the district court's attorney fee award, though we leave open the possibility that the court may consider the question anew if any party requests attorney fees after the case has concluded.

¶50    We also note, however, that an appellate court has discretion to "provide additional guidance on issues that are likely to recur on remand." *Sheppard v. Geneva Rock*, 2021 UT 31, ¶ 47, 493 P.3d 632. And we often exercise this discretion to address arguments that have "been fully briefed and argued" on appeal and that are likely to arise again in further proceedings in the case. *Busico v. Carver*, 2023 UT App 162, ¶ 53, 542 P.3d 956, *cert. denied*, 554 P.3d 1095 (Utah 2024); *see also State v. James*, 819 P.2d 781, 795 (Utah 1991) ("Issues that are fully briefed on appeal and are likely to be presented on remand should be addressed by this court."). Here, the parties have briefed and argued the question of whether the fees that Capozzoli incurred defending against the counterclaims fall outside the scope of the REPC's attorney fee clause—and, thus, whether they're recoverable. Because that issue is likely to arise on remand, we choose to give some guidance on it now.

¶51    The provision at issue states that in "the event of litigation or binding arbitration *arising out of the transaction* contemplated by

the REPC, the prevailing party shall be entitled to costs and reasonable attorney fees." (Emphasis added.) The term "transaction" naturally refers to an "exchange or transfer of goods, services, or funds."[6] And the "transaction" in question here was, of course, the exchange of money for title to the House.

¶52    As noted, Madden's counterclaims are based on statements that Capozzoli made to her as part of her offer to purchase the House. On a plain language basis, we conclude that the phrase "arising out of the transaction" is broad enough to encompass statements made in the offer that led directly to the REPC in question. And this conclusion is supported by caselaw from our court and other jurisdictions that have considered similar questions. In *Nelson v. 15 White Barn Drive LLC*, for example, we affirmed the district court's award of attorney fees to the defendants under a real estate purchase contract where the defendants successfully defended against a fraud claim that was based on the same transaction. 2022 UT App 106, ¶¶ 25–26, 517 P.3d 1062. And in *Hahn v. McElroy*, an Illinois appellate court likewise considered the scope of an attorney fee provision that allowed an award of attorney fees to the prevailing party in "any action with respect to this Contract." 2023 IL App (2d) 220403, ¶ 47, 239 N.E.3d 792. In the court's view, this clause was broad enough to entitle the defendant to recoup fees that were incurred defending against a claim of fraudulent inducement that was based on conduct that occurred while negotiating the contract. *Id.* ¶ 49.

¶53    Here, the attorney fee provision in question naturally encompasses Madden's counterclaims. As a result, if either party requests attorney fees at the conclusion of the case on remand, the

---

6. *Transaction*, Merriam-Webster, https://www.merriam-webster.com/dictionary/transaction [https://perma.cc/B4TG-Z4D6 ].

district court may decide to include in its award any fees that were incurred with respect to the counterclaims.[7]

CONCLUSION

¶54    We affirm the district court's damages award because there was sufficient evidence to support it. But we reverse the district court's dismissal of Madden's counterclaims and third-party claims, and because we've done so, we also vacate the attorney fee award. We accordingly remand for further proceedings that are consistent with this opinion.

———————

7. The parties also dispute whether the request for attorney fees that was made below complied with rule 73(a) of the Utah Rules of Civil Procedure. We have no need to decide this issue. Insofar as a party would in theory need to file a new motion for attorney fees once the litigation has again concluded, any such error (if it was even error) would be curable on remand.